1334.12, 1334.92, Genesis Hill v. Betty Mitchell. Oral argument not to exceed 30 minutes per side, Ms. Lau, for the respondent, Appellant Cross-Appley. Good afternoon, Your Honors. May it please the Court, I'm Jocelyn Lowe, appearing on behalf of the Warden, and I'd like to reserve 10 minutes for my rebuttal argument. Okay, that's fine. Thank you, Your Honors. Your Honors, the Warden asks that you reverse the District Court's grant of the writ in this case, because both Mr. Hill's argument and the District Court's finding that the preliminary police report was Brady material requires the stacking of tenuous inferences on a flimsy foundation. Both arguments that the statement to investigate why the mother ran from the police and asked for police to check the alley behind the house several times require speculation that Ms. Dudley in that statement is referring to where the baby's body was found when she asked the police to check the alley. As the Warden stated in our brief, there are two alleys at issue in this case because there are two buildings. When the police arrived in the evening hours of May 31st and the early morning hours of June 1st, they found Ms. Dudley laying on the ground as Officer Givens testified at trial, and Officer Givens is the officer who prepared the preliminary report at issue in this case. And the parties agree, I take it, that Officer Givens' report was not turned over to the defense in a proper and timely fashion? Correct. Both parties agree that this police report was not provided to the defense at trial. And in fact, when the Warden provided discovery in federal habeas of the prosecutor's files, this report was not among them. So it appears to be an item that was not provided by the police to the prosecutor for discovery. So we agree that it was suppressed material. However, to say that it was material for the purposes of a Brady violation requires speculating as to what his one sentence about her running from the police and asking the police to check behind the alley means. It requires us to speculate that she did in fact run, that she would have said she ran from the police when multiple witnesses, including Officer Givens, testified that she was laying on the ground bawling and crying when the police arrived. Ms. Dudley spent most of the evening following the police officers around, and there's testimony in the record, both from her and from other witnesses, that prior to the police arriving, she was all over the place. She was at her house. She went to Mr. Hill's house. She went looking for her mother. So it's not clear what he is referring to when he says she ran from the police. But it is clear from his testimony at trial that when he initially arrived, she was laying on the ground crying with her mother and cooperated with police and allowed them to search her home and around her home and then went with them to Mr. Hill's house when they conducted a search. In as much as it was Givens's report that said, given the opportunity or with more time, he would investigate why she ran from the police, that was his statement, right? That's his statement as to why. So why wouldn't that be something that the defense ought to have been able to cross-examine him on? They could have asked, Your Honor, they could have asked Officer Givens about the statement that she ran from the police. However, on the back of the report, the same report that he wrote, he also wrote that when he received the radio run regarding family trouble, when we arrived, mother and grandmother were laying on the ground crying. So most of it would be impeachment as to Officer Givens for the inconsistent statements in his report. It's not clear how that would be substantial material to cross either, undermine the credibility of either Officer Givens or Ms. Dudley on when the testimony at trial was that she was laying on the ground crying, not just from Officer Givens but from other witnesses. So it doesn't raise to the level of Brady materials, especially in light of the other evidence in this case and given the substantial cross of Ms. Dudley that did occur at the trial. They proved that she lied on her direct testimony under oath at trial on a number of occasions. She lied about being in a bar that night. She lied about either her mother or her having sole control of the baby throughout that day. She lied about being at Mr. Hill's home earlier that day. She lied about having a fight with Mr. Hill earlier that day. She stated that Mr. Hill had never threatened the child and they also called into question during the defense presentation of testimony, her fitness as a mother talked about the fact that one of her neighbors said it was often that she would abandon the child to whoever would take it over. That she had the baby in unfit living circumstances and that he was close to calling CPS. This isn't a case where Ms. Dudley was the key star witness, the only person who tied Mr. Hill to the scene of the crime. There is substantial other evidence that indicates and that was sufficient for the conviction, more than sufficient for the conviction of Mr. Hill. But not looking at an insufficiency of the evidence issue here, at least not with regard to the Brady claim. Correct. What we're saying is or what we're asking here is if the defendant had had that part of the report, is there a reasonable chance that the jury would have looked at this case in a different light? Correct. And given the substantial amount of cross-examination impeachment of Ms. Dudley that occurred and the substantial damage to her credibility on the defense's presentation that occurred, there is not a reasonable probability that these two speculative pieces of evidence would have undermined the conviction in this case. They are cumulative to the substantial impeachment of Ms. Dudley that had already occurred. And Ms. Dudley's testimony is not the only piece of evidence that convicted Mr. Hill. There's physical evidence in this case as well as the testimony of other witnesses and Mr. Hill's testimony himself. Mr. Hill denied initially to police that he had been in Ms. Dudley's apartment building on the night of the offense. A fingerprint of his was found on the light bulb in the hallway outside the doorway where the child went missing from. And in a later statement to police and then again on the stand at trial, Mr. Hill admitted that he had gone into the apartment building that night and had unscrewed the light bulb. So he placed himself at the scene of the crime shortly before Ms. Dudley came out of the building crying that her child was missing. The fact that he denied taking the child is not surprising. It would be surprising if he had gotten up and completely inculpated himself. But that's not the only evidence in this case that convicted Mr. Hill. Before you go into that other evidence, one thing I wondered about in connection with a statement that's in the police report about look in the alley. Yes, Your Honor. I want to, I think, ignore the question of which alley or behind which house was she allegedly referring to. As I understand the facts of this case, the police ultimately found the body a day or two afterwards in a place where they had searched the prior day where the body was not located, right? Correct. So assuming that that's true, it suggests that the body was someplace else and then placed a day later behind Hill's house. Correct. So even if you assume that she was referring to look at Hill's house, look behind Hill's house, and even if you assume that she knew the body was there because she killed this child and she put the body there, the body actually wasn't there. Correct. So what do we make, from the state standpoint, what do we make of that statement in light of the fact that it would not have been true had the police done what she was telling them to do? Your Honor, I think the points that you've made point to the fact that her statement does not impeach her because it does not implicate her in the crime. Her directing them to look to the alley behind Mr. Hill's house on June 1st when the baby's body is not behind Mr. Hill's house means that there's no link to be made between her asking them to check behind the alley or check in the alley. As opposed to her having said check behind the house and then you actually. Yes, and as you stated. That demand from her that they look in the alley would seem to imply, at least, that she knew they weren't looking for a live baby. That her asking them to check in the alley? Yes. I mean, this was what, a six-month-old baby? This is a six-month-old child, yes. So probably not crawling down the alley on her own hook. No, and there's testimony that the child was not independently mobile yet, that she was not crawling at this point at six months old. So I think she would know, you know, Ms. Dudley's probably, like any mother, would be concerned that the child was not mobile on its own. She hasn't heard it crying. She didn't wake up to it crying when it was taken from her. So she's concerned that they need to be looking for a child somewhere where the child could not be heard, whether it's dead or alive. She's concerned that the child is somewhere that it can't be heard or isn't being found on its own, such as behind her house. She knows that there's a large wall and a drop behind her house. And at this point, she knows that she's been told by others that Mr. Hill was seen entering her house and not leaving. So the next logical conclusion is that he took the child over the wall behind the house, which is also an alley. You say the record supports the fact that she made that statement after she was told that the witnesses didn't see him come out? Her friends say that when she came out screaming and looking for the child, they said, you know, Genesis has been here. Did these witnesses also tell her at that point that they saw him go in, but they hadn't seen him come out? I believe so, Your Honor. We can check that. Her argument is, if that's true, that's why she was saying, look, behind the house, because he didn't come out the front. Correct. And in addition, she's there when they search. When they search Mr. Hill's house, she knows no child is found in the house, despite the fact that there's multiple people, multiple family members in the house, and they conduct a complete search of his house. So knowing the neighborhood, she's asking them to check areas where she can think of her child having ended up. As Judge Batchelder pointed out, this is not a mobile child. She's six months old. She would have to be carried or placed somewhere. And if she's not in a house, she's not being heard from, then the concern is that she's outside somewhere. She doesn't ask them to check the lot where the baby is actually found. And as you pointed out, Your Honor, the baby is not in the lot and is not in the alley. Officer Givens testifies that he searched Ms. Dudley's house when he arrived at the scene, as well as the alley behind her house, then went to Mr. Hill's house and conducted a search of Mr. Hill's house in cooperation with the residents there. And then Officer Beaver testifies that early in the morning of June 1st, he comes out, he searches the alley behind Mr. Hill's house, as well as the vacant lot where the baby is eventually found. He's present again the following day, June 2nd, when Officer Steinhardt conducts a search and finds the formula box with D'Amico wrapped up inside of it. Is my recollection right that there was no evidentiary hearing here? That's correct, Your Honor. I know this is going to be outside the record, but has anybody ever asked the police officer about that statement, the saying that she ran? There's no affidavit or anything. Correct. There's no affidavit from the officer. I'm not aware of anyone asking Officer Givens. I've never personally asked Officer Givens. I don't even know if he still works for the Cincinnati Police Department. So no one has asked him about the report. That's, again, why it's speculation that this line, the two pieces of it, one of which is contradicted by his report itself, and the second piece, which is ambiguous, to say that that leads to substantial material impeachment of Ms. Dudley requires stacking an inference that she's referring to the alley, that that would have impeached her credibility more than the evidence that was already provided to the jury and that would have led them to create a different result. I know you addressed this issue a little bit in your briefs, but would you speak a little bit to the issue of the grand jury testimony and the asserted differences in Ms. Dudley's testimony as to who was with her when this barrette was discovered and inside the garage, outside the garage, that sort of stuff. Those are issues that have been raised by the petitioner as well. Yes. Your Honor, I would note that the district court found cause and prejudice based solely on the preliminary report before adding the grand jury testimony. The grand jury testimony, at grand jury she testified that in the morning she, Denise, and Renisha went and looked in the garage, that she was standing outside the garage, looked down and found the barrette. And the district court stated that this was inconsistent with her testimony before the petit jury, which was to quote her petit jury testimony. Me, Barbie, and Pam went down there and Ruby was standing outside and Denise. Then Denise gave me her shirt and I set it out there and they, to stop quoting her, but they said that they would help her look. And so she and Denise and Renisha went up to the park where I live and came back down and started looking in the garages. I went down and her barrette was right there and I found it. Am I right that the record reflects that law enforcement had searched that area before and not found the barrette? No. Officer Gibbons testified that he was not aware when he conducted the search of Mr. Hill's house that the garage was attached to the property. And so law enforcement had not searched the garage the night before. Denise and Renisha, when they testify during the defense's presentation, they testified that they had been through the garage, that when they were looking for the child, they went in there, but there's no indication that law enforcement had been in there before June 1st. When Officer Beavers comes back on June 1st to do a search is when Teresa approaches him and says this is the barrette that was found in the garage. So at trial, Teresa is slightly confusing both on direct and cross, but her testimony is that she went and is consistent with Denise and Renisha's testimony as well. She went back to Mr. Hill's house on June 1st. She's cold, she's shaking, and Denise offers to get her sweatshirt. She puts on the sweatshirt and then the three of them go and search the garage. They all disagree as to how exactly the barrette was found because Denise and Renisha are adamant that it was not there the night before. One of them even testifies that it was not there when she walked in the garage and all of a sudden appeared when Teresa pointed it out. And then one of them picked it up and handed it to her, and she put it in her pocket to hand over to the police later that day. But Denise testifies that the barrette provided at trial is the barrette that she handed to Teresa from the floor of the garage. The question about who was with her and the question about whether she was standing inside or outside, which seems to now be the focus of this case, is at least arguably slightly different from the question about was the barrette there the day before when the women went in the garage. Did that point, was the barrette there when the women went in the garage the night before, i.e. or did the mother plant it the next day, did that come out during the trial? Yes. So the question on the barrette is just who was with her. Correct. And was she inside or outside the garage when she saw the barrette? Correct. So there's no dispute that it was actually found inside by the door. It's confusing in the testimony where the barrette was found because how they each describe the garage setup is different. So when they're referring to the front and the back and the door and the side and this is open and that's open, it's confusing who is talking about where this barrette exactly was found. I'm just trying to figure out whether there's any significance to the question, assuming there's a discrepancy, whether she was inside or outside if the barrette was found next to a door, whatever door that was. Because if she's inside and it's inside, she can see it. If it's next to the door and she's outside and can see through the door, then she can see it. So I'm just having trouble figuring out what difference that makes. I would agree that I'm also having trouble figuring out what difference that makes because all three, Denise, Vanessa, and Teresa, who are the three people we know were there when the barrette was found, all three agree that they were the three people there when the barrette was found. All disagree as to exactly what happens around the time the barrette was found. The key point of the barrette is whether the mother planted it or not. Correct. That, you say, came out as to it wasn't there the day before. Or she says she finds it the next day. Correct. Because either Denise or Vanessa testifies that, I believe it's Vanessa, she walked in, she looked in the exact spot, the barrette was not there. All of a sudden Teresa says, hey, look, there it is, and it's there. And Denise testifies that Teresa had been walking around, I believe it's Teresa, with her hands in her pockets. And they cast suspicion to the point that on cross-examination the prosecutor asked directly, are you implying that she planted the barrette? And the response is something like, I can't say that, but she was walking around with her pockets and all of a sudden the barrette was there. So there's significant questioning and indirect testimony to imply that she planted this barrette. And that there's also testimony from Denise that there are other children in the household who would have worn similar barrettes, although Teresa testifies that this is a barrette that she had placed in Damika's hair that night, that she placed three barrettes and that there were two when Damika's body is found. But the barrette, again, is not the only physical evidence in this case. The formula box is tied to his house, the outermost garbage bag that Damika is wrapped in is tied to his house. She's also wrapped in electrical tape. When his uncle goes looking for it in response to a police question, the electrical tape is no longer there. And Teresa and Barbara both identify the shirt wrapped around the child's head as being one similar to the one that Mr. Hill wore in addition to the fingerprint, Mr. Hill's own statements, and the statements of the bus driver. I see that my time has expired, so I will. You will have your full rebuttal. Thank you. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, Justin Thompson on behalf of Petitioner Genesis Hill. I'd like to discuss why the suppression of this evidence denied Genesis Hill a fair trial. This Court has consistently held that the nondisclosure of a legitimate suspect is an egregious violation of Brady. In this case, the state-suppressed evidence, which Judge Sargas correctly noted, would have crippled the state's case against Genesis Hill. Because of the state-suppressed evidence in this case, the jury never knew that at the earliest stages of the investigation, Teresa Dudley's behavior indicated that she knew much more about the disappearance of her baby than she let on the police. She ran from the police when they first came to her house after she reported her baby missing. Counsel for the state says that that statement is there in the report that was not turned over, but that also in that report is something that indicates that she did not run from the police. There is something in the report that says she was crying, but they're certainly not. That doesn't mean they're inconsistent. I mean, she could have easily been crying when the police officer pulled up and then ran afterwards. But the statement— That's not what it says. The evidence, supposedly, from both the other part of the report and other witnesses say she and her mother were laying on the ground crying when the police officer walked up. Is there any doubt that that's what the record shows? I don't think there's doubt that she was crying at some point, but Officer Givens specifically put in his report that she ran when he first approached her. We said two things in the report that at least appear to be inconsistent. Is that correct? I would disagree. I think she could have been crying and then ran afterwards. It says, when I drove up, she was lying on the ground crying. Right. Now, how can that be consistent with she ran first? I think she ran after. I think he pulled up and she was outside. There was crying. It was emotional, and she ran afterwards. Okay. Well, that's helpful. Now, there are other witnesses that did testify as to the events of that night when the police officer arrived, correct? Correct. And they all say that she was lying on the ground crying? Correct. Now, is there any suggestion from the testimony of any of the other witnesses that she ran? No, because the report was suppressed, so they had no reason to ask this question. I didn't ask you whether they had a reason. I just asked you, did anything come out one way or the other about assuming that she was laying on the ground and assuming your hypothesis is that she might have run afterwards based on this statement in the report? Is that supported or refuted one way or the other by any of the other witnesses? No. And it's just because they weren't asked? Because they weren't asked and they didn't have this report, so they didn't know to ask those questions. In one of the cases we cited in our brief. But, again, the state also says that she worked closely with the police as soon as they arrived from that point onward. She went with them everywhere they went and was offering comments or suggestions or whatever, something, again, that seems at least inconsistent with running, does it not? Well, the same report also noted it wasn't just running. It was also that she specifically requested that additional investigation be conducted regarding Teresa because of her suspicious behavior. He specifically noted that he thought her behavior was suspicious. Knowing more than she should have known, directing them more to look, he thought that was suspicious, and that's exactly why they brought them into the police station that night. The police brought her to the police station. They questioned her. They gave her a lie detector exam. I'm not saying that this is your obligation to do this, but I'm just as curious. I'm curious why the state hasn't tried to locate this police officer and ask about this inconsistency. But I guess I'm equally inconsistent why you have not either because it seems to me that could go, depending on what the officer says, if he remembers this, could go a long way towards addressing essentially the harmless error nature of this if, in fact, it's harmless. Well, that would have been addressed on post-conviction review, and there's arguments that his post-conviction lawyer did very little work. So that would have been the opportunity to explore that. And he had no investigator. He had no funds. The claims he did file were very – it was a very short and less than thorough post-conviction petition, so that's when that would have been raised and it never came up. It wouldn't have been raised unless they knew about this police report. Well, there's – one of our other – Did they know about it at that point? No, not in state post-conviction. And it wouldn't have come up then either. That – the suppressed report? Right. Correct. All I'm trying to find out, and maybe it's not important, I don't know, once the report did come up, I'm just curious if you have an answer why nobody's ever explored it. There's a lot of rules in federal habeas on what we can do with expanding the record. We've never – after we presented this to Judge Sargas, at that point, based on the record alone, he granted the writ, so there was no reason for us to explore further. After he granted the writ, we put this evidence in front of him, and he granted the writ. So at that point, there was no reason to explore this issue further. And if there is – You actually never asked for an evidentiary hearing. We didn't have to because he granted the writ. No? No. All right. I got it. Thank you. As far as materiality, Judge Batchelder, you said that the question is whether this is favorable evidence puts the case in such a different light as to undermine confidence in the outcome. Judge Sargas considered this and said that this would have crippled the state's case. Given the amount of cross-examination of the mother, what do you think your best argument is as to why this statement that I would have liked to have done meant more investigation as to why she ran? Why is that crippling, using that word? Why is the report crippling? Well, it's not the report. It's this phrase. It's the two statements in the report. Because it does two different things. Teresa Dudley was, as Judge Sargas noted, was the key witness in this case. She provided the motive, the circumstances around the disappearance. She testified to finding the bread, identifying the T-shirt that the baby was found in. So what the suppressed evidence does is it destroys her credibility and it undercuts the key pieces of evidence that tied him to the case. Now, the state says that every single thing that you attributed to her as being the key evidence was actually either came from a different witness rather than the mother or was corroborated by a different witness other than the mother. Now, is that true or untrue? Untrue. In what respect? Well, the three key pieces of evidence in this case were the bread that we've talked about, the baby being in the box behind Genesis Hill's house, and the shirt. Those are the three key pieces of evidence. They're all undermined by the braiding material because they all are introduced into this case or they're all associated with Teresa Dudley at a time when she knew she was a suspect and she had an incentive to point the finger at somebody else. I hate to ask all these questions, but the box is something that I think it was the grandmother said was a box that was outside Hill's house, and then they match up the numbers on the formula or something. Right. So that doesn't come from Teresa. Well, Judge Sargas expressly considered that in his order. I'm not asking what Judge Sargas said. I just want to know your best argument. So this issue of the shirt, yes, she identified that shirt as one that he had, was similar to one that he had, but other witnesses did that as well, did they not? In regards to the box? The shirt. The shirt. Well, the one other witness was Barbie Sue Jansen, and Judge Sargas, he noted that there was a distinction between the two, that Teresa was much more confident in identifying the shirt. She testified that she was the girlfriend. She knew he was more drugged. So we got the box. You have a limited amount of time. So you got the box. You got the shirt. What was the third key thing from the mother? The Brett. The Brett. But the Brett is not we're talking now about your statement and the judge's statement that this issue of she ran and searched the alley had been known would have crippled the case. Correct. That's not the Brett. That's a different issue. Knowing that she was a suspect, knowing the suspicious behavior that she engaged in, knowing that she had an incentive to point the finger away from herself and at somebody else, and then the key pieces of evidence that are associated with her after she's a suspect. She was directing the investigation. After she's a suspect, evidence keeps popping up, and it comes back from her. The Brett, the baby in the box behind the house, and the shirt are all tied to her. And specifically to the box, which you mentioned, there was testimony from an aunt that she left that in the alley on Saturday morning. Judge Sargis noted that Teresa Dudley was seen in that same alley. That's exactly when she found the Brett on Saturday morning. That's exactly after she had been released from the police department. She'd been given a lie detector exam, so she knew she was a suspect, and that's exactly when she went back to the house. So not only is the Brett found there, but that's exactly when the box was left in the alley. And Judge Sargis noted that she had access to that box, and so did many other people. So it's not directly tied to Genesis Sale. It came from his house. And I think one last question. This business about look in the alley, why is that impeaching or incriminating as to the mother? Because this wasn't just one offhand remark. I understand that if the baby had been found in the alley, I get that, but the baby wasn't found in the alley. There's the house, the garage, the alley, and then there was a lot right behind the alley. So we're talking in the same general area. Well, that's assuming that she was referring to Hill's house when she was referring to alley. You don't really know whether it was her own house where apparently this perpetrator, whether it was this defendant or not, left the house, right? If I understand it correctly, you're asking if we don't know which house she was referring to? Right. Well, two answers. Number one, this is the report in question. There's ten questions on this report. Genesis Hill has referenced on it, out of ten of those questions, he's referenced eight times. So the key point, this document is written from the perspective. So let's assume she's talking about the alley behind Hill's house. Right. Now, given that the baby was not found in that alley, I'm just trying to understand your argument as to why is that inculpatory of her or impeaching of Mr. Hill. Because it wasn't just one offhand remark. The officer thought it was suspicious that she said it multiple times, and it was maybe not exactly. It was found in the alley, in the lot behind that alley, which is where she was referring to. So this wasn't just one offhand remark. So you're essentially inferring that when she said alley, that also included the lot. Correct. Behind the alley. Yes. Okay, I got it. Thank you. And another important point that Judge Sarkis considered, it wasn't just that. Well, actually, I'll backtrack. Your question about the baby not being there on Saturday and then being found Sunday, I can explain that a little more thoroughly. As far as the timeline of what we know happened that day, the question is she tells him to search that area. The lot is searched on Saturday, and then the baby is found on Sunday. So why is that important? The answer is she knew she was a suspect on Friday night into Saturday morning. She was taken to the police station. She's questioned. She's released. So she knows at that point she's a suspect. She was back in that alley on Saturday, acting suspiciously. That's where the box was left. Now, she couldn't have done anything then because this is when the police are still coming and going. But she definitely had access to the box, and she knew she was a suspect. So the earliest possible time she could have put the box in there would have been Saturday night. Given the fact that the police were there on Saturday, it's light out that day. And, in fact, there's evidence to support that's what she did because her next-door neighbor. But you have to assume that when she said, look in the alley, and we're also assuming that meant also look in the lot, that she then knew or had some idea that all this was going to unfold. She's going to come back the next day, get the box, put the baby in the box, and put this baby out in the lot. Those are all inferences that you have to make to come to the conclusion on that point that you're making, don't you? Correct, but there's a strong piece of evidence that happened during that timeline that supports that. Her next-door neighbor, friend, and babysitter, Barbie Sue Jansen, was overheard saying on Saturday night that the baby was dead in a box. So this wasn't just a, I think the baby is dead. This was a very specific comment. The baby is dead in a box. And then the baby is found the next day. That doesn't come out of this police report. No. That came out in the trial. Correct. So how is the statement about the alley then crippling, given that what did come out during the trial? I'm sorry, can you repeat that again? Given that the statement about the baby is dead and the baby is in a box, how can this fact that she's referring to go look in an alley the day before then be crippling as to her credibility in light of the evidence that did come in? That evidence actually never came in. Which evidence? The Barbie Sue Jansen evidence did not come in. It was defense counsel called a witness, or they brought her into court, but then she actually never testified. But that did come out in the record that defense counsel had became aware at the very end of the trial that Barbie Sue Jansen, the friend and neighbor and babysitter, was overheard saying the baby was dead in a box. Now how that relates in as far as Brady goes, Brady instructs that prejudice can be found from other areas. Had they had this, they certainly could have known. If they had known about her suspicious behavior, that she's telling them where to look, she's running, she's considered a suspect, they certainly would have learned at a much earlier time that they need to do an additional investigation regarding Teresa if anybody else had seen suspicious behavior. So it's very likely to conclude that had they known that, had they had this report, they could have expanded their investigation and learned about Barbie Sue Jansen much earlier than they did. And had they done that, there's a specific timeline of not only, as the counsel for the warden concedes, she's lying repeatedly about important facts, she's running from the police, she's directing the police to the area where to search, she's considered a suspect. The body is found in the general area where she tells them to search. Her friend, neighbor, and babysitter knows the baby is dead in a box on Saturday night. So that's two of the state's witnesses. Had this been turned over, two of the state's witnesses. Why was Barbie Sue Jansen not called? She was testified. She was the first witness called by the state. But this never came up because the issue of her knowing the baby was dead in a box never came up because defense counsel didn't learn of that until the end of the trial. Did they try to do anything with it at the end of the trial? It's unclear, and I've looked on that, and I'm not sure if there was something off the record. Defense counsel said she was ready to testify, but there was another witness ready to go, so they had to push it back. The prosecution objected on lack of notice, and there's no specific finding from the judge as far as what he was if he was going to let them bring this witness in. He implied that they could bring Barbie Sue back in and they could ask these questions, but then she was never called and the issue never came up again. So I'm not sure exactly why. An important point also regarding the fact that Teresa was impeached. Counsel for the warden brought that up, and I think that's an important point because that's one of the key factors in this case that distinguishes it from many other cases. Now, during Teresa's testimony, actually first, Judge Sargas considered this. He said there's very little in the record to indicate Teresa was impeached in any way. During her testimony, she's not asked any questions about being a suspect. She's not asked any questions about running from the police. She's not asked any questions about where to look for the baby. They did ask questions about Brett, that's true, and it went nowhere because they didn't have any context of it. In this court, in Robinson v. Millisay, has said— You're sort of losing me there about particularly the suspect part. Defense counsel, I assume, knew that she had been taken to the police department and questioned and you said given a lie detector test, right? Correct. So now from that you're inferring obviously that she was a suspect, right? Yes. So why would you be asking her if she was a suspect of the police? Matter of fact, how could she even testify to that? That testimony would come up from the police, not from her. That's a good point. That was my very next point, that they certainly could have asked questions about the police and it never came up during the police either because they didn't know. Because they didn't know. You're saying they would have asked the police officer if they suspected her had they known about the alley comment and the supposed running. Right. I understand that. And that never came up. The officers would never ask any of those questions. In fact, during the prosecution's closing argument, he specifically addressed defense counsel's attempt to impeach Teresa and he called it, quote, a sad situation. In defense counsel's closing argument, in their last argument to talk to the jury as far as why they shouldn't convict Genesis Hill, they conceded that they only scored minor points on Teresa. As I said before, just imagine the closing argument they could have had if collectively all this evidence they did knew. Not only did she lie about where she was that night, the circumstances about the disappearance, that when the police did come, she ran, that she directs police to the area where to search, she's considered a suspect, her friend knows where the body is. None of this information came in. As Judge Sargas noted, this evidence went to the heart of the case and the jury didn't hear any of it. I think, as I mentioned before, that's one of the key distinguishing factors in this case. Judge McKeegan, in your opinion, in the Jalowit case, there was suppressed evidence there. Are you saying that the Barbie Sue, whatever her last name is, that her testimony was suppressed by the state? No, I'm saying had they learned about Teresa being a suspect much earlier, that they could have expanded their investigation and they could have learned about that. Because Brady instructs that prejudice can be found from other… But if they had her available as a witness, are you saying they never even talked to her first? They had her as a witness, but they had no idea that… they had no way of knowing to ask these other questions. Why would they have asked any additional questions of her that they did? Because they saw something in a police report that said she ran. Why would that cause them to ask additional questions of this other witness? Of Barbie Sue? Yes. My point on Barbie Sue is that prejudice under Brady can be found from areas that prompt additional investigation. So had they known Teresa was a suspect, had they known she ran, had they known she had been acting suspicious, they certainly could have expanded their investigation and learned at a much earlier time that Barbie Sue had made that statement. Just repeating what you said before, I'm trying to figure out specifically, why would they have asked more questions of, what is her name, Barbie Sue? Barbie Sue. Barbie Sue, if they saw in a police report that the mother ran. Why does one lead to the other, other than just saying it? Because I think if they knew, and I'll try to answer it differently this time, if they knew that Teresa was suspicious and there was a close connection between the two, I mean, there was testimony, they were friends, neighbors, treat Barbie Sue as her babysitter. If they knew that, I think they definitely would have expanded their investigation. And had they, they could have learned this and then presented the information. All right. As I was just briefly mentioning, the Jalouk opinion that you wrote, the distinction with this case and many others, there was suppressed evidence in that case. But in your opinion, you noted in that case that the witnesses in that case were thoroughly cross-examined, weaknesses in the state's case were exposed, the jury was aware of most of the evidence, and the evidence that they weren't aware of was had marginal value. None of that's true in this case. You know, this evidence went to the star witness, and the jury never heard any of it. And as far as, you know, counsel for the warden mentioned other areas, or other evidence that pointed to guilt. So before my time's up, I'd like to discuss that briefly. There's four key pieces of evidence in this case that remained untouched from the Brady material. The trash bags, the tape, there's a bus driver, and the fact that Genesis Hill was seen in the house that night. Now, the bus driver, you know, in the brief they note that there was a bus driver who identified Hill, and it's written as if there's a direct identification of hearing a statement. But when he's called in to testify, he says, quote, I could not really honestly say that it would be him or not. So the witness certainly has no faith in his identification. So that's far from overwhelming evidence of guilt. You know, if he can't even identify him in court, that's not overwhelming. In regards to the trash bags, Judge Sargas noted that there was significant problems with that testimony. To get the point across, I'll just read, you know, one of the questions. His testimony was that he lined the trash bags up, kind of like in a jigsaw. But on cross-examination, he was asked, question, are there some creases that are on one side of the dividing line that do not continue across? Yes, sir. Question, can you explain why that doesn't continue across the division line? Answer, no, I can't. He was also asked, can you tell with any scientific certainty whether these lines are created in the manufacturing process or by a different action after the bag left the box? No, I can't. He also noted that there were no fingerprints on the bag. So that's certainly far from overwhelming evidence. Regarding the tape, the inference is here that from the warden's perspective that the police searched for tape and Hill's uncle couldn't find it. But that's not what the record reflects. He was asked about his tape, and he said, quote, I don't have any more because I remember using it up on my clippers. And I looked on my box and I said I had used what I had on my clippers and the tape they got came from my clippers. So there's an acknowledgment from him that he did provide the tape. And during trial they presented no testing of that. There's no testing. There's no comparison analysis. So that evidence never came in. So that's certainly, if they don't even use it, that's certainly not overwhelming. The final point regarding the other evidence was the fact that he was seen in the area that night. Genesis Hill, the first officer he did talk to, he denied being there, but Officer Hennekes testified that on June 1st and June 4th he was interviewed and he was consistent that he had been there and he never denied it. Teresa Dudley also testified that it was common for him to be there, that he spent the night and he had permission to come and go as he pleased. So the fact that he was there is certainly not any overwhelming evidence of guilt. He was there on a regular basis. They spent that entire day together. So it is what it is. He lived right around the corner from her, so he was always over there. So that's not any compelling evidence of guilt. As Judge Batchard, you noted, this is not a sufficiency evidence case. But at least with regard to the Brady issue that is before us. Yes. It's actually a fifth thing, isn't there, that you didn't mention, and that's the person who overheard supposedly this conversation about he'll kill the bitch. I have that written here too. You haven't gotten to that? I will now. And I think that's a perfect example of just how weak their case is. There was two pieces of testimony on that. Barbie Sue Jansen was the first witness called. She testified that she overheard a conversation where Genesis Hill told Teresa Dudley, she said there was an argument, and Genesis Hill said, the bitch is going to die before I pay any child support. Now, at its best, it's inconsistent. At its worst, it's completely unbelievable. Because Teresa Dudley is called as a witness the same day, and she's asked the very same question, did Genesis Hill ever threaten you? And she says no. Not only did he not threaten me that day, he's never threatened me, period. And he's always been respectful to my sisters. He's never threatened me. So there's nothing, you know, if there was a witness who was in a position to remember that and testify to it, it would have been Teresa. She had all the incentive to know about that, so she's much more credible on this. And she said it never happened. Did Teresa ever testify against Genesis Hill? Yes. In terms of saying? She did say that there was a conversation that she said, I'm going to pay you child support, and he said, I bet I don't pay. But it was nothing threatening at all, and there was nothing contested. Let me ask the question another way. You're suggesting that she's not to be believed on this because the one witness is not to be believed on this because Teresa didn't corroborate it. But she never offered testimony that she never said, I think he killed my baby, or this is what he did to kill the baby. She never turned on him, did she? She never uttered those words, but she identified the three key pieces of evidence against him. And all three pieces of those evidence, the bread, the baby in the box behind the house, and the shirt, are all associated with her. So you're just saying that had she been lying about all these other things that you claim she's lying about, she obviously would have also corroborated this other statement about killing somebody. I can't speculate on that. I think she said that just because it's true. She was asked a specific question, did he ever threaten you, and she said no. And there was no history of violence between the two. There was a conversation about child support. These were two 18-year-olds at the time, and he jokingly said, I bet I don't pay. And I think an important point, they had spent the entire day together, so this isn't any kind of ongoing contentious relationship. They had spent that entire day together. I take it the whole sense here is not that some third party snuck in and snatched this child and killed the child, right? Correct. The underlying theme here is that the mother did it. Yes. Is the suspicion that you and Genesis Hill have that this occurred between the time that the baby was determined to be missing or some earlier point? I'm not sure, but I think an important fact is the fact that Teresa testified, and she never wavered on this. She was adamant that she was home the entire night and that she never left. A bartender testified that that was a lie. So we know what she said, the circumstances of being home all night with the baby. The bartender certainly has no dog in this fight. Aside from Teresa, who's the last person to have seen the baby alive? We don't know, and that's a good question, because if she was not where she said she was, if she's not home with the baby and she's at a bar, could she have been alone and there have been an accident? Could somebody else be with her? Could it have been Barbie Sue Jansen? And that's why she keeps pointing the finger at Genesis Hill, too, making statements that weren't substantiated. So we don't know. The coroner testified in this case that she could not rule out an accident. So there could have been an accident. She's at a bar. There are certainly reasons people don't leave six-month-old babies home alone, and an accident could have happened. And then she's a suspect, and she's pointing her finger at somebody else along the way. And, in fact, Hill says it's an accident later on to his probation officer, right? That came in at the sentencing phase. His probation officer came in and said that there was an accident, but there was nothing under oath. There was no cross-examination, no direct examination. So that's certainly something at a retrial the state could explore. But as the record stands now, there's nothing in the record. And there very well may have been an accident in this case. This is a case where the state offered manslaughter prior to trial, which would have had Genesis out in ten years. So there's maybe some truth, or maybe the prosecution did know that there was an accident. We don't know. And I see that my time is up. If there's no further questions. Apparently not. Thank you. Appreciate it. Ms. Lowe, you will have your puddle. Thank you, Your Honors. Your Honors, I'd like to go back to exactly what the report says, because the report does not simply say that she was crying. The report reads on the back, additional comments, received radio run regarding family trouble. When we arrived, mother and grandmother were lying on ground crying. Not simply that they were crying and running around. He says that they're lying on the ground crying. And when he testifies at trial, which is on page 156 of the joint appendix, he repeats that. He says that they were laying on the ground crying when he pulled in. Had Genesis Hills Council had that report, then certainly the question could have been raised, then what do you mean here that she ran when you approached her? That's a question that could have been asked, but it's speculative what it would have. Well, of course it's speculative, because it wasn't asked. How were they supposed to know to ask the question if they didn't have the report? Because the neighbor, Mark Davenport, is the only person who testifies about any running around from the police. The fact that Officer Givens testifies and writes in his report means the report is completely ambiguous. And furthermore, even if he had testified, she ran for me initially. There's certainly substantial other evidence pointing to Mr. Hills' guilt and supporting this conviction beyond Theresa's investigation. What did the neighbor say? You're referring to the neighbor having testified as to what happened after the police arrived. One neighbor, Mark Davenport, testifies in the defense counsel case. He's the same neighbor who testifies that Ms. Dudley was a horrible mother, that he wouldn't let his dog live in her house, and that he was about to call CPS on her when D'Amica went missing. And he makes a comment that she initially had run away from police officers when they arrived, but it's inconsistent with testimony of the other people who testified, including Officer Givens, the officer who initially responded. So they had an indication of, if they had wanted to ask this question, of what happened. But I did want to point out that the report itself is internally inconsistent. I'd also note that the idea that this report would somehow lead the defense counsel at trial to ask the police if they had suspected Ms. Dudley when there was other evidence, as Your Honors pointed out, they were aware that she had been taken to the police station and that she had been polygraphed that night. And furthermore, the idea that that would have been an admissible question to ask, it would have been asking the officers for opinion testimony as to who they identified as suspects that evening, requires stacking inferences as to what this one line in a report would have led the defense counsel to investigate prior to trial, would have led the answers to be at trial, would have led them to call different witnesses at trial, not just around Ms. Dudley, but around these other witnesses. Barbara Sue Jansen did testify at trial, and the evidence that they're referring to about her making a comment about a baby in a box is not testimony from or a statement from Ms. Jansen. It comes when one of the attorneys, during a break in the trial, represents to the court that they have, the defense attorney, represents to the court that they have recently learned of a witness, Alexis Davenport, who wants to testify or can testify that Ms. Jansen made this statement on June 1st.  He has not provided this witness to the state, although he does say that he would be, there would be a remedy for that, allowing a brief continuance. And two points out that Barbara Sue Jansen was never asked about this statement on direct, and so the idea that he's going to, he says, I'm not going to tell you what I would do, I'm not going to direct you how to do your trial, but if you call her you need to lay a foundation for providing this testimony, is what he tells them. At the end of the defense counsel's presentation, defense counsel indicates that they have two additional witnesses who they've decided not to call after consulting with their client. They're aware of Ms. Davenport, she's in the courtroom, she's appeared pursuant not to her own subpoena, I believe, but alongside her husband, Mark Davenport, so they made a tactical decision not to call her. But again, saying that Barbara Sue Jansen's statement somehow would have come in or would have, this report would have led defense counsel to make a different strategic choice about information they did know at the time of trial requires speculating that the statement about the alley would somehow lead them to conclude that Ms. Dudley was an even stronger suspect than they had already cast her to be in their testimony. They spent a significant amount of their time in the defense presentation of evidence and on cross of Ms. Dudley, casting her as the only other possible suspect and making her behavior seem suspicious. In addition to casting doubt about the circumstances behind which the barrette was found, his aunts testified that they had seen her sneaking around his house, had seen her in the property, and one aunt testifies that she actually had the police come down and ask her to leave the property on June 1st. So they had done more than simply ask her why she ran from police, they made it, they presented evidence that Ms. Dudley was in the house and had access to the evidence that was tied to D'Amica's death. In addition, the evidence tied to D'Amica's death is not affected by this police report, the five pieces of evidence. The bags, the tape, the bus driver's statement, Genesis Hill's admission that he was in the house that night, and Barbara Jansen's statement about the threat that was made about I'll kill that little bitch in response to a discussion that they had earlier that day. None of that is affected by the police report, none of that is affected by Teresa Dudley's credibility. There's also Mr. Hill's own conduct, as testified to by Officer Givens, that when they went to his house to search for the child, one, it took him 20 minutes to come outside and speak with the police officers, and two, during the search of his house for his six-month-old daughter, he was smirking and grimacing, seemed nonchalant, and not at all concerned about this baby being missing. There's also counsel for Mr. Hill speculates that somehow after she became aware of the fact that she was a suspect, somehow after she was released from the police station, she had sufficient time to go seek out this box and place the baby in it from who knows where. The box itself was tied to Mr. Hill's house. Officer Beaver, I believe, testified that he had seen it in the alley behind the house. The aunt testified that it was the type of box and that was where she had placed it after it was empty of formula, and the batch numbers tied it to the house that Mr. Hill lived in. It's a large house divided into apartments. So that evidence is independent of Ms. Dudley, and that is the same speculative chain that Trials Counsel attempted to cast at the trial itself. They presented the jury with testimony that Ms. Dudley had access to the house and was behaving suspiciously, that she would have had access to his clothing, she would have had access to the formula box, and the jury made a credibility determination and chose to convict Mr. Hill. None of the evidence that could directly be linked to this police report as being admissible would undermine the conviction of Mr. Hill, and that's why the report is not material Brady evidence and the grant of the writ should be reversed. I'd also like to make one final point. Judge McKeague, you asked about the fact that there's been no follow-up with the police department. I would point out that they found the report, as we did in our brief. This report was uncovered in 2007 as a result of a private investigator retained by Mr. Hill's counsel making a public records request to the Cincinnati Police Department. Although they obtained an affidavit from the defense attorney, they have not sought to obtain one from the police department, and it is their burden to prove a Brady violation. In addition, the report found in 2007, there's an affidavit in the record supporting that it's found in 2007, was not presented to the federal court or any state court until 2010, and as we argued in our brief, their lack of diligence supports a finding that they should not have been able to provide this report as support for cause and prejudice to excuse not providing it to any state court, and it should not have been added to the record because they were not diligent in presenting it to the federal court. If there are no other questions? Apparently not. Thank you very much for your argument, and thank you, both of you, for your very thorough arguments today. We very much appreciate hearing from both of you. With that, the case will be submitted, and you may adjourn court. The following court is adjourned. Thank you. Thank you. Thank you. Yes, it's just a way to thrill. It's so nice that you're here. Yes, yes. It was a good argument, too. Yes. Mr. Thompson did a great job, didn't he? Mm-hmm. The judge seems interested. Mm-hmm. So what's the next steps from here? Well, we'll wait for a decision from the court. Mm-hmm. And hopefully it will uphold the grant to the rig, which would mean a new trial. Okay. Now, if they reverse it, then we'll have to appeal to the U.S. Supreme Court. This is the district court. Oh, okay, okay. So it's not going to be an instant decision. It takes time before we get a decision. Yes, that takes about a year. I'm thinking probably a year before we know what's going on. Yeah. Yeah.